

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 4, 2026

**BY ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Michael Edwards*, S2 23 Cr. 578 (JGK)

Dear Judge Koeltl:

The Government respectfully submits this letter in advance of the May 11, 2026, sentencing for defendant Michael Edwards, and in response to the defendant's sentencing memorandum, dated April 27, 2026.  (Dkt. 186 ("Def. Br.")).  On November 13, 2025, Edwards pleaded guilty to Counts One through Six of Superseding Indictment S2 23 Cr. 578 (JGK).  Count One charged Edwards with conspiring to commit bank fraud.  Count Two charged Edwards with conspiring to possess with intent to unlawfully use a postal key.  Count Three charged Edwards with conspiring to steal mail and receive stolen mail.  Count Four charged Edwards with possessing a stolen postal key with the intent to steal mail.  Count Five charged Edwards with theft of mail. Count Six charged Edwards with aggravated identity theft.

Edwards was the primary leader and most culpable member of a conspiracy to steal checks from the mail, alter those stolen checks, and deposit the altered checks into the bank accounts of co-conspirators.  Edwards' criminal conduct lasted for years, including on pretrial release after he was initially arrested in July 2023 for stealing over $170,000 in mail.  Throughout the course of his participation in the conspiracy, Edwards and his co-conspirators stole tens of millions of dollars in checks, resulting in millions of dollars in actual losses to victims.

For the reasons explained below, the Court should impose a sentence below the applicable United States Sentencing Guidelines range of no less than 120 months' imprisonment, followed by three years' supervised release.  Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing.

I.      **Background**

    **A. Offense Conduct**

    **1. The Mail Theft and Check Fraud Scheme**

Between at least in or about January 2022 and at least in or about July 2024, Edwards was the leader of a widespread scheme to unlawfully obtain U.S. Postal Service ("USPS") arrow keys and use those arrow keys to steal checks and other mail from USPS collection boxes, including in the Upper East Side in Manhattan.[1] (PSR ¶¶ 15–18). The scheme involved checks mailed from numerous states, with checks deposited in at least Connecticut, Florida, Pennsylvania, and South Carolina. (PSR ¶ 15). After the checks were stolen, Edwards and his co-conspirators fraudulently altered those checks—for example, by altering the check amount or payee information—before posting them for sale on social media or depositing them into bank accounts held in the name of third parties recruited by members of the conspiracy. (PSR ¶ 20). Specifically, Edwards posted more than approximately $42 million in stolen checks on Telegram between at least November 2023 and July 2024. (PSR ¶ 22). In addition to posting the altered, stolen checks for sale, Edwards and his co-conspirators also deposited the checks into bank accounts registered to other co-conspirators (so-called "dirty bank accounts") and subsequently withdrew substantial amounts of the deposited funds for their personal use. (PSR ¶ 19, 21).

As a leader of the scheme, Edwards was directly involved in all aspects of the conspiracy's activities. For example, he coordinated the acquisition of and payment for stolen USPS postal keys with co-conspirators through Telegram and other online messaging platforms, discussing the pricing for the keys and explicitly seeking postal keys that would unlock collection boxes in various neighborhoods in Manhattan, including the Upper East Side, the Diamond District, and the Financial District. (*See* PSR ¶ 35(g)). In addition to negotiating the purchase of postal keys through online messaging platforms, Edwards also coordinated mail theft trips with other co-conspirators, including the mail theft trip that resulted in his arrest on July 10, 2023. (PSR ¶¶ 18, 30). The photograph included immediately below depicts one of the postal keys that Edwards discussed purchasing with his co-conspirators, specifically the postal key that Edwards ultimately purchased and used on July 10, 2023. (PSR ¶¶ 26, 30, 32).

---

[1] USPS collection boxes are lockable receptables into which individuals may deposit mail to be sent through the USPS, and from which postal carriers pick up such mail. (Presentence Investigation Report ("PSR") ¶ 17). Arrow keys, or postal keys, are distinctively shaped USPS keys that can be used to open multiple mail receptacles in a Zip code or mail route. (PSR ¶ 18).



Similarly, Edwards was intimately involved in procuring account information and bank cards for dirty bank accounts that the members of the conspiracy used to deposit checks after they were fraudulently altered. (PSR ¶ 19). As reflected in Edwards' electronic messages with other members of the conspiracy, Edwards discussed with other co-conspirators details such as the financial institutions that would be less likely to scrutinize the deposits, the deposit limits and account ages for putative dirty bank accounts, and demographic and employment information for the holders of putative dirty bank accounts. (PSR ¶ 21). Edwards' electronic communications further demonstrate the leadership role that he played. As one example, in or about April 2023, Edwards told a co-conspirator that he needed the login and password for a particular TD Bank account. After the co-conspirator responded that the account holder wanted to know how much they were putting in her account, Edwards responded "Bro tell tht bitch send the info. It either we doing her shit or I'm on to the next." In another example from March 2023, Edwards directed that same co-conspirator to provide the account information for his minor cousin for purposes of depositing an altered check. (PSR ¶ 35(f)).

Edwards also participated in and oversaw the fraudulent alteration of stolen checks using the names and bank account information of other individuals. Indeed, on multiple occasions, Edwards directed co-conspirators to alter checks in exchange for small payments of a couple hundreds of dollars. (PSR ¶ 19). On these occasions, Edwards instructed the co-conspirators regarding the details of the alterations to ensure that the altered check would evade detection by the victim banks. (PSR ¶ 35(c)–(d)). And after those checks were altered, Edwards either sold them by posting them on his Telegram channel (which had more than 3,000 subscribers as of August 2024) or by arranging for other co-conspirators to deposit those checks in dirty bank accounts, approximately 40% of which Edwards kept. (PSR ¶ 36).

### 2. Edwards' Arrest and Continued Criminal Conduct

Edwards' participation in this fraud scheme resulted in his arrest on July 10, 2023, after officers observed Edwards fishing for mail from a post office box on the Upper East Side of Manhattan while Mercado, his co-conspirator, idled in a car next to the collection box. (PSR ¶ 30). NYPD officers observed Edwards fishing for mail and attempted to intercept Edwards and his co-defendant Mercado. (PSR ¶¶ 30–31). When the officers activated the emergency lights of their car, Edwards jumped back in the car, and Mercado started driving away. (PSR ¶ 31). The NYPD officers, who had exited their vehicle, identified themselves as police and ordered the defendants

to stop. (PSR ¶ 31). During the vehicle's flight from law enforcement, Edwards and Mercado nearly struck a police officer with the car before careening down the wrong way on a one-way street and colliding head on with a nearby livery vehicle. (PSR ¶ 31). After the collision—which resulted in the livery driver being taken to the hospital—Edwards and Mercado continued fleeing the scene on foot before being apprehended and arrested. (PSR ¶ 41).

Following Edwards' and Mercado's arrests, NYPD officers recovered an arrow key from the collection box on Lexington Avenue and East 74th Street, as well as approximately 350 pieces of unprocessed mail from a bag in the car that Edwards and Mercado used. (PSR ¶ 32). In that single mail trip alone, the mail that Edwards and Mercado stole contained at least approximately $176,286.87 in stolen checks. (PSR ¶ 34).

Edwards continued to engage in this and other criminal conduct, however, even while on bail under pretrial supervision. On or about October 17, 2023, U.S. Postal Inspectors in Connecticut searched Edwards' residence pursuant to a search warrant obtained by the U.S. Attorney's Office for the District of Connecticut. (*See* PSR ¶ 6). During that search, Postal Inspectors recovered, among other things, numerous checks, money orders, and debit cards, a paper cutter, a printer with check stock found in the printer, a box of check stock, approximately $34,970 in U.S. currency, and a firearm and magazine in an unlocked safe. (*See* PSR ¶ 36). Photographs of the firearm and magazine are set forth below:





Following a bail revocation hearing on November 1, 2023, during which the Government sought Edwards' remand, Magistrate Judge Stein permitted Edwards to remain on pretrial release, but increased Edwards' bond and required that it be secured by his mother's residence. (Dkt. 29; *see* PSR ¶ 6). But Edwards continued to engage in the same fraudulent conduct, including by posting approximately $42 million in checks for sale on Telegram. (PSR ¶ 36). Photographs of posts that Edwards made to his Telegram channel between May 2024 and July 2024, which solicit buyers for stolen checks and depict the "Only1Giela" brand logo that Edwards used, are set forth below:







Based on Edwards' continued commission of criminal conduct while on pretrial release, as shown by the evidence seized by Postal Inspectors in October 2023 and Edwards' Telegram posts, a grand jury in this District returned Superseding Indictment S1 23 Cr. 578 on August 6, 2024, which added charges for bank fraud and aggravated identity theft, expanded the timeframe for the conspiracy with which Edwards was charged, and alleged Edwards' commission of crimes while on pretrial release. (Dkt. 58). Of note, the S1 Indictment alleged certain overt acts, including posts that Edwards made on his Telegram channel. (*Id.*). That same day, after the grand jury returned the S1 Indictment and just 22 minutes after the Government informed Edwards' then-defense counsel of the S1 Indictment, Edwards deleted the contents of his Telegram channel, leaving only a post with two smiley faces. (*See* PSR ¶ 37). A photograph of Edwards' Telegram channel as of August 6, 2024, taken by law enforcement, is set forth below:



Ultimately, Edwards' fraud scheme—which encompassed conduct in multiple states, among multiple co-conspirators, over more than two years, and involving more than 2,600 stolen checks—resulted in a total intended loss of approximately $57,248,376.35, of which at least $10,859,090.95 was deposited into dirty bank accounts. (PSR ¶ 38).

### B. Charges, Plea, and Guidelines Range

As noted above, on July 10, 2023, Edwards was charged by Complaint with violations of 18 U.S.C. §§ 111 (attempted assault of an officer engaged in official duties), 371 (conspiracy to commit theft of a postal key, theft of mail, and receipt of stolen mail), 1704 (theft of a postal key), and 1708 (theft of mail), arising from Edwards' conduct on July 10, 2023. (Dkt. 1). On November 6, 2023, a grand jury in this District returned Indictment 23 Cr. 578, charging Edwards with violations of 18 U.S.C. §§ 371, 1349, 1704, 1708, and 2, arising from the same conduct charged in the Complaint. (Dkt. 30). On August 6, 2024, a grand jury in this District returned Superseding Indictment S1 23 Cr. 578, which, in relevant part, charged Edwards with his participation in the broader conspiracy from January 2022 through at least in or about July 2024, including while on pretrial supervision, and substantive mail theft and postal key theft arising from his July 10, 2023 arrest. (Dkt. 58). On or about June 12, 2025, a grand jury in this District returned the operative Superseding Indictment S2 23 Cr. 578, which, in relevant part, charged Edwards with one count

of conspiracy to commit bank fraud, including while on pretrial release (Count One); one count of conspiracy to commit theft of a postal key (Count Two); one count of conspiracy to commit mail theft, receipt of stolen mail, and sale and receipt of stolen money, including while on pretrial release (Count Three); theft of a postal key (Count Four); theft of mail and receipt of stolen mail (Count Five); and aggravated identity theft (Count Six). (Dkt. 81).

On November 13, 2025, Edwards pleaded guilty without a plea agreement to Counts One through Six of the S2 Indictment. The Government's *Pimentel* letter dated November 13, 2025, calculated an offense level of 43 for Counts One through Five and a Criminal History Category of III, with a mandatory term of imprisonment of 24 months for Count Six, which must run consecutive to any other sentence imposed. In addition, because Edwards committed the offenses charged in Counts One, Three, and Six while on pretrial release, the Court may impose an additional sentence of up to ten years imprisonment for each of those counts, and any such sentence must run consecutive to any other term of imprisonment that this Court imposes. *See* 18 U.S.C. § 3147(1). Thus, the correct Guidelines range, as indicated in the PSR, is 1,020 months' imprisonment for Counts One through Five, with a mandatory and consecutive term of 24 months' imprisonment for Count Six. (PSR ¶ 128).

Specifically, the Government calculated Edwards' offense level based on the following:

- Under U.S.S.G. § 3D1.2(d), Counts One through Five are grouped together;

- Under U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1), the base offense level for the Group is 7;

- Under U.S.S.G. § 2B1.1(b)(1)(L), the offense level is increased by 22 levels because the intended loss is more than $25 million but not more than $65 million;[2]

- Under U.S.S.G. § 2B1.1(b)(2)(B), the offense level is increased by 4 levels based on substantial financial hardship to five or more victims;

- Under U.S.S.G. § 2B1.1(b)(4), the offense level is increased by 2 levels because the offense involved receiving stolen property;

---

[2] Edwards objects to the PSR's calculation of $57,248,376.35 in intended losses. (*See* Def. Br. at 2-4). The Government estimated this amount by totaling the dollar amounts of fraudulent checks attributable to the conspiracy, as reflected in bank records and electronic communications stored on Edwards' mobile devices. Edwards does not appear to dispute this number or methodology. Insofar as he contends that this amount was not reasonably foreseeable (Def. Br. at 4), this Court should reject such an argument because evidence of these fraudulent checks was collected from his own mobile devices and his own Telegram channel. And whatever the merits of Edwards' policy disagreement with Section 2B1.1, he cannot dispute the legal permissibility of using intended loss as the measure of loss under Section 2B1.1. *See United States v. Rainford*, 110 F.4th 455, 475 (2d Cir. 2024).

- Under U.S.S.G. § 2B1.1(b)(10)(C), the offense level is increased by 2 levels because the offense involved the use of sophisticated means;

- Under U.S.S.G. §§ 1B1.3(a)(1)(B) and 2B1.1(b)(16)(A), the offense level is increased by 2 levels because the offense involved the reckless risk of death or serious bodily injury;

- Under U.S.S.G. § 3B1.1(a), the offense level is increased by 4 levels because the defendant was an organizer or leader;

- Under U.S.S.G. § 3B1.4, the offense level is increased by 2 levels because the defendant used a minor to commit or conceal the offense;

- Under U.S.S.G. § 3C1.1, the offense level is increased by 2 levels because the defendant obstructed justice; and

- Under U.S.S.G. § 3C1.3, the offense level is increased by 3 levels because the defendant committed Counts One, Three, and Six while on pretrial release.

The Probation Department independently calculated an offense level of 43 based on substantially the same offense-level calculations set forth in the Government's *Pimentel* letter, except that the Probation Department declined to apply the 4-level increase under U.S.S.G. § 2B1.1(b)(2)(B) for substantial financial hardship to five or more victims and instead applied a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A) for the offense involving 10 or more victims.[3] (*See* PSR ¶¶ 52–70). In addition, Probation calculated a Criminal History Category of II, determining that the defendant's two convictions resulted in two criminal history points.[4] (*See* PSR ¶¶ 67–75).

In total, Probation calculated an applicable Guidelines range of 1,020 months' imprisonment based on the appliable statutory maximums, including the mandatory, consecutive terms of imprisonment based on Edwards' commission of Counts One, Three, and Six while on pretrial release. (PSR ¶ 128; PSR at 34). Probation also calculated a mandatory consecutive term of 24 months' imprisonment on Count Six. (*Id.*) The Probation Department recommends a below-Guidelines sentence of 108 months' imprisonment. (PSR at 34). The defendant seeks a sentence of 60 months' imprisonment. (Def. Br. at 4, 8). On March 4, 2026, this Court sentenced Mercado—who was the least culpable of the charged co-conspirators—to 28 months' imprisonment. (Dkt. 175). On February 18, 2026, this Court entered a *nolle prosequi* dismissing

---

[3] Because the difference between the Court's application of the 4-level increase under U.S.S.G. § 2B1.1(b)(2)(B) and a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A) is immaterial to the Guidelines calculation, the Government has no objection to the application of the latter instead of the former, without conceding that the former is inapplicable.

[4] The Government's *Pimentel* letter erroneously calculated five criminal history points (thereby placing Edwards in Criminal History Category III) based on the same two criminal convictions. The Government agrees with the Probation Office's calculation of the defendant's criminal history points and his placement in Criminal History Category II.

the charges of co-defendant Shuron Malone, who passed away while his case was still pending. The cases of three of Edwards' other co-conspirators are currently pending.

## II.     Applicable Law

As the Court is aware, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After making the initial Guidelines calculation, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines

and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.  To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.  The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### III.  Discussion

#### A.  A Below-Guidelines Sentence of No Less than 120 Months' Imprisonment Is Appropriate

An aggregate sentence of 120 months' imprisonment, including the mandatory consecutive 24 months' imprisonment required by Count Six, followed by three years' supervised release, is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.  Such a sentence reflects the seriousness of the offense, promotes respect for the law and provides just punishment, and reflects the acute need for general deterrence, specific deterrence, and incapacitation.

##### 1.  The Seriousness of the Offense and Need to Provide Just Punishment

A substantial sentence is warranted given the nature and circumstances of the offense.  For more than two years, Edwards led a multi-million dollar fraud scheme involving at least seven other individuals, including the co-defendants charged in this case.  As a leader, Edwards' criminal conduct involved, but was not limited to, facilitating the acquisition of USPS arrow keys, stealing mail from USPS collection boxes, altering stolen checks, recruiting co-conspirators to provide their bank account information to receive the proceeds of altered checks, running a Telegram channel on which he posted stolen checks for sale and to advertise the successes of his criminal operation, and coordinating the payment of co-conspirators for their involvement in the scheme.  In short, Edwards' hands touched every aspect of the criminal scheme in his leadership capacity, and he was quite literally in the business of receiving and selling stolen checks from the U.S. mail.

Stealing mail—especially using a USPS postal key—is a very serious offense.  Far from being victimless, millions of Americans rely on the U.S. mail system and trust the USPS to send important items of monetary, professional, and personal value, whether they be rent checks, bill payments, passport applications, job applications, financial aid applications, tax filings, or even a card to a loved one.  Indeed, in 2024 alone, approximately 112.5 billion pieces of mail were delivered by the USPS.  United States Postal Service, "A Decade of Facts & Figures," *available at* https://facts.usps.com/table-facts/ (last visited Feb. 24, 2026).  Notably, during one incident alone, the incident for which Edwards was initially arrested on July 10, 2023, Edwards and his co-defendant Mercado stole nearly $200,000 in checks from the mail before they were intercepted by law enforcement.

The seriousness of Edwards' conduct is underscored by the impact on its victims, which includes innocent victims whose checks were unlawfully obtained by Edwards and his co-conspirators, the financial institutions that were defrauded when those stolen checks were deposited, and the integrity of and public trust in a government agency that provides a crucial system to the public. Moreover, Edwards' use of a postal key—property belonging to the USPS that can unlock multiple USPS mailboxes—aggravates the seriousness of his conduct, as such mailboxes and mailbox locks must be replaced after the postal key falls into the wrong hands. At bottom, Edwards's conduct impaired the integrity and operations of a government agency that provides a crucial service to the public, and it is deserving of appropriate punishment to promote respect for the law.

Edwards' criminal conduct was also extensive. Not only did Edwards and his co-conspirators routinely fish for stolen mail and alter stolen checks, Edwards even ran a Telegram channel like an illegal business where he advertised his criminal activity. One purpose of such a channel was to sell stolen checks that buyers would then deposit. By promoting his criminal conduct in such a public fashion, however, Edwards' reprehensible conduct was especially insidious because it served to inspire others to engage in similar criminal conduct. In fact, one of the individuals whom Edwards and his co-conspirators recruited to provide a dirty bank account was a minor. Recruiting others to engage in criminal conduct for the prospect of quick material gain significantly undermines the rule of law and puts the community in danger. To make matters worse, Edwards continued to run this channel after he had been arrested and was on pre-trial release for this offense. Edwards' brazen conduct warrants a substantial period of incarceration.

In addition, Edwards has repeatedly engaged in obstructive conduct in this case, which undercuts his acceptance of responsibility. To start, on the night of their arrests, Edwards and Mercado fled from law enforcement who had been attempting to arrest them after observing them fishing for mail in a mailbox on the Upper East Side. (PSR ¶¶ 30–31, 41). By fleeing in a car that was driving at a high rate of speed, Edwards and his co-defendant Mercado directly endangered the physical safety of others. (PSR ¶ 41). Despite law enforcement's instructions to Edwards and Mercado to surrender after being caught in the process of stealing mail, they decided to flee from law enforcement instead, nearly hitting an NYPD officer with their vehicle before crashing head-on into another vehicle while driving the wrong way on a one-way street. (PSR ¶ 31). Although the NYPD officer—who was on foot—was fortunate to avoid being hit, the livery driver—who needed to be taken to the hospital for medical treatment—was not so lucky. (PSR ¶ 41). Edwards also obstructed justice by deleting his Telegram channel after learning of the Government's investigation. (PSR ¶¶ 37, 48). In sum, Edwards' flight from law enforcement and his management of the Telegram channel are both substantial aggravating factors that reflect his consciousness of guilt, failure to comply with the law, and complete disregard for the safety of others.

In addition, Edwards' criminal history is especially concerning and warrants a substantial sentence. As Probation emphasizes, Edwards has two prior criminal convictions and he "previously benefited from leniency in the form of suspended terms of incarceration for both prior convictions. Nevertheless, he reengaged in criminal conduct, which confirms that less restrictive sanctions were ineffective as it failed to deter him from committing further crimes." (PSR at 36).

Despite these repeated second chances and the fact that he was on pretrial release, Edwards still chose to possess a firearm, which, as Probation notes, is "alarming" and demonstrates his "ongoing disregard for the law."  (PSR at 36).

## 2.  The Need to Promote Respect for the Law and Provide General and Specific Deterrence

The need to deter Edwards and others from similar types of offenses also supports a substantial sentence. *Accord United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018) (general deterrence considerations "argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it").  Based on statistics compiled by the U.S. Postal Inspection Service, mail theft increased significantly during the COVID-19 pandemic, with more than 27,000 mail theft complaints in fiscal years 2021 and 2022.  *See generally* Office of the Inspector General, United States Postal Service, "U.S. Postal Service's Response to Mail Theft," *available at*  https://www.uspsoig.gov/sites/default/files/reports/2023-10/22-178-r23.pdf  (last visited Feb. 24, 2026).  Of course, none of this is surprising: Edwards' mail theft and check fraud conduct was a lucrative enterprise that did not require much financial overhead, such as expensive equipment or a physical place of business.   Indeed, Edwards' criminal conduct resulted in more than $10 million in checks deposited into dirty bank accounts—and as described above, Edwards and his co-defendant Mercado stole nearly $200,000 in checks in just one night.  Moreover, Edwards' was able to orchestrate a multi-million dollar fraud scheme at little to no cost.  For example, Edwards used Telegram and other free online messaging platforms to obtain dirty bank account information, to post pictures of deposit slips and stolen checks for sale, and to coordinate the purchase of postal keys, mail theft trips, and the altering and deposit of fraudulently obtained checks.  And in stark contrast to the millions of dollars generated by the fraudulent enterprise, Edwards paid various co-conspirators mere hundreds of dollars to drive him around to steal mail and obtain postal keys, to alter stolen checks, and deposit fraudulently altered checks into dirty bank accounts.   In other words, this conduct that presents significant financial upside with low barriers to entry is precisely the kind of calculated conduct that can and should be generally deterred with a meaningful sentence.  In addition, the criminal conduct that Edwards engaged in is especially difficult to detect and prosecute.  That is so because the financial loss, even when substantial in the aggregate, is often so diffuse that individual victims have little incentive to come forward, causing the loss to be written off primarily by the banks, which themselves may not be in a position to tie various losses to a particular perpetrator to go to law enforcement.  Accordingly, the need for general deterrence warrants a significant sentence in this case.

Likewise, specific deterrence considerations also support a substantial sentence in this case.  As explained above, in addition to conspiring with other adults to commit the crimes charged, Edwards also recruited minors to participate in the scheme.  (PSR ¶ 35(f)).  Put simply, nothing in the record offers any reason to believe that, had Edwards not been remanded by this Court, he would have stopped stealing mail and depositing altered checks on his own.  Indeed, months after Edwards' initial arrest and while he was on pretrial release, law enforcement officers searched Edwards' residence in Connecticut in October 2023.  During the search, the officers found, among other things, check stock loaded into a printer, an additional box of check stock, checks, $30,000 in cash, eight cellphones, and a firearm, which the defendant, as a previously convicted felon, was

not allowed to have.  The recovered items demonstrate that stealing mail and altering stolen checks was more than just a hobby for Edwards, it was a professional operation through which he unlawfully obtained a considerable amount of money.

From there, Edwards not only continued his criminal operation but arguably escalated it, further highlighting the need for specific deterrence.  Even after these items were seized in October 2023, Edwards continued his operation, specifically by starting a new Telegram channel in November 2023.  Edwards used the Telegram channel to post pictures of open mail, stolen checks, and deposit slips to solicit buyers who would pay him for checks that he had stolen but would not deposit himself.  In total, the Government's analysis of the Telegram channel revealed that Edwards posted more than 2,000 unique checks with an aggregate face value of well over $40 million.  Thus, Edwards continued to engage in the same criminal conduct not only while on pretrial release, but also after having been given multiple opportunities to remain on pretrial release despite the Government's arguments for detention.

Furthermore, Edwards once again obstructed justice in this case, after the Government found out about his new Telegram channel, which also points to the need for specific deterrence. The Government obtained the first superseding indictment in this case on August 6, 2024.  At approximately 1:36 p.m. on that date, the Government informed defense counsel of the new indictment against Edwards.  At approximately 1:58 p.m., just 22 minutes later, Edwards erased his Telegram channel and included one final post consisting of two smiley face emojis.  This timeline strongly suggests that Edwards deleted the channel to destroy evidence that the Government could use to prove that he committed the crimes with which he is charged.  What is more, the defendant's decision to taunt law enforcement by posting two smiley faces underscores the brazenness of his conduct and his complete lack of contrition.  In addition, as explained above, Edwards recruited others (including minors) to participate in the scheme, and he continued to engage in the *same* criminal conduct while on pretrial release.

### 3.  The Defendant's Mitigation Arguments Do Not Justify a Sentence of 60 Months

The defendant asks that the Court impose a sentence of 60 months' imprisonment primarily for the following reasons: (1) the defendant has demonstrated rehabilitation while in pretrial incarceration (Def. Br. at 1–2); (2) the Sentencing Guidelines, specifically Section 2B1.1, are excessive for economic offenses for first-time offenders (*id.* at 2–4); and (3) the defendant's personal characteristics, specifically his health conditions, make a carceral sentence especially harsh (*id.* at 5–7).  None of these arguments justify such a low sentence for Edwards' extensive criminal conduct.

*First*, that the defendant has possibly refrained from committing additional offenses while incarcerated is not a legitimate reason for a reduced sentence.  Indeed, as noted above, the defendant continued to engage in criminal conduct while on pretrial release.  That the defendant has largely, though not entirely, avoided further sanction while in prison is commendable, but the fact that the defendant is abiding by rules while in prison—as he is required to do—does not warrant a more lenient sentence.  Moreover, the fact that the defendant's liberty had to be taken

away for him to refrain from committing further crimes highlights the need for an extensive term of imprisonment.

*Second*, the defendant's arguments that the Sentencing Guidelines overstate his culpability should be rejected. Even assuming for the sake of argument that the Court should give less weight to the loss amount, the main drivers of the defendant's substantial sentencing Guidelines range are the other enhancements, which the defendant does not challenge. In fact, if the Court recalculates the defendant's Guidelines range to exclude any point increase due to loss amount, his Guidelines range would still be 70 to 87 months' imprisonment, which itself is higher than the defendant's request. But, of course, the offense did involve considerable financial loss to many victims— namely, more than $10 million in actual losses. In other words, this is not a case in which the defendant's Guidelines range is primarily driven by an overinflated intended loss amount. Indeed, even if the Court applied a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K) based *solely* on the actual losses resulting from Edwards' offenses, the defendant's Guidelines range would still be the statutory maximum of 1,020 months (to be followed by the mandatory consecutive 24 month term required under Count Six).

*Third*, although the Government acknowledges that Edwards' health issues may make his time in jail more challenging, the Government's below-Guidelines recommendation, which effectively eliminates any enhancement attributable to the loss amount, adequately varies downward to account for this mitigating factor. Moreover, the defendant has presented no evidence that his medical conditions are unique or that the Bureau of Prisons will be unable to treat his medical conditions. In fact, as Probation notes, "the defendant's medical conditions are manageable and does not preclude the imposition of a custodial sentence." (PSR at 36). Accordingly, the defendant's medical conditions—though undoubtedly proper for the Court to consider under Section 3553(a)—do not warrant the drastic downward variance that the defendant requests here.

### B. This Court Should Impose $10,859,090.95 in Restitution and Forfeiture

For the reasons set forth below, the Court's sentence should also include the imposition of restitution and forfeiture, each in the amount of $10,859,090.95.

With respect to restitution, the Mandatory Victims Restitution Act ("MVRA") requires a defendant to make restitution to the victim of "an offense against property under [Title 18], . . . including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), "in which an identifiable victim or victims has suffered a . . . pecuniary loss," *id.* § 3663A(c)(1)(B). "Because 'the purpose of restitution is essentially compensatory,' and because the MVRA itself limits restitution to 'the full amount of each victim's loss,' a restitution order must be tied to the victim's actual, provable, loss." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012) (internal citations omitted). There is, however, no legal requirement that the victim's losses be determined with "mathematical[] precis[ion]"—nor has the Second Circuit "ever adopted a one-size-fits-all standard of precision for application in restitution cases." *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013). The Government "bears the burden of proving a victim's actual loss by a preponderance of the evidence." *Id.* at 92. Here, the Court should impose restitution in the amount of $10,859,090.95, which represents a conservative and reasonable estimate of the fraudulently

altered checks that were deposited into dirty bank accounts—that is, the actual losses suffered by victims of the offense—based on electronic evidence from Edwards' electronic devices (including photographs of deposit slips and electronic communications with other co-conspirators about deposits) and bank records.[5]

With respect to forfeiture, the forfeiture allegation for the bank fraud conspiracy charged in Count One requires Edwards to forfeit any property constituting or derived from proceeds that he obtained directly or indirectly from committing that offense, including proceeds traceable to the commission of that offense. *See* 18 U.S.C. § 982(a)(2)(A). Similarly, the forfeiture allegations for the mail theft conspiracy and substantive offense charged in Counts Three and Five require Edwards to forfeit any property that constitutes or is derived from proceeds traceable to committing those offenses, including proceeds traceable to the commission of those offenses. *See* 18 U.S.C. § 981(a)(1)(C). Here, the Court should impose forfeiture in the amount of $10,859,090.95, which represents the reasonably estimable fraudulent deposits within the defendant's possession or control.[6]

---

[5] The Government is continuing to determine the extent to which the $10,859,090.95 in losses suffered by senders of these checks were reimbursed by the respective financial institutions, which would impact the payee for restitution. *See* 18 U.S.C. § 3664(j) (providing for restitution to be paid to a party who provided compensation for a victim's loss). To enable the Government to confirm who the relevant restitution recipients should be, the Government respectfully requests that the Court orally order $10,859,090.95 in restitution at sentencing, but to defer a restitution order for the statutory period of 90 days. *See* 18 U.S.C. § 3664(d)(5).

[6] As explained above, the U.S. Postal Inspection Service seized approximately $34,970 in U.S. currency from Edwards' apartment on or about October 17, 2023. The Government intends to forfeit this amount as specific property.

IV.    **Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a below-Guidelines, aggregate sentence of 120 months' imprisonment followed by three years' supervised release.[7]  The Government also respectfully requests that the Court order restitution and forfeiture, both in the amount of $10,859,090.95.


Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _/s/_____
Jerry J. Fang / William K. Stone
Assistant United States Attorneys
Southern District of New York
Tel. 212-637-2584 / -2521

cc: Mark S. DeMarco, Esq. (by ECF)

---

[7] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).  As for the electronic search condition specifically (PSR at 40), the Government believes that this condition is warranted given that Edwards engaged in his criminal conduct using electronic devices and accounts, including by communicating with each co-conspirators about and in furtherance of the scheme, altering stolen checks, depositing those checks, running the Telegram channel, and sending and receiving electronic payments connected to the scheme.  In addition, given the financial nature of the crimes, including bank fraud, the financial special conditions (PSR at 39–40) are also justified.  Edwards does not appear to object to the imposition of any of the special conditions recommended by the Probation Office.  (*See* PSR at 33; *see generally* Def. Br.).